# In the United States Court of Federal Claims

No. 17-603C
(Filed: June 1, 2017)*
**\*Opinion originally issued under seal on May 23, 2017**

<table>
<tr><td>

IRON BOW TECHNOLOGIES, LLC,

     Plaintiff,

v.

THE UNITED STATES,

     Defendant,

and

ALAMO CITY ENGINEERING
SERVICES, INC.,

     Defendant-Intervenor.

</td><td>

Post-Award Bid Protest; Temporary
Restraining Order; Preliminary
Injunction; Technical Evaluation; Price
Evaluation; Likelihood of Success on
the Merits; Irreparable Harm; Balance
of Hardships; Public Interest

</td></tr>
</table>

*James C. Fontana*, Tysons Corner, VA, for plaintiff. *Jeffry R. Cook* and *L. James D'Agostino*, Tysons Corner, VA, of counsel.

*Robert M. Norway*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for defendant. *Steven R. Hall*, Assistant Counsel, Marine Corps Systems Command, Stafford, Virginia, of counsel.

*Richard J. Conway*, Washington, DC, for defendant-intervenor. *Michael J. Slattery*, New York, NY, of counsel.

## OPINION DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**FIRESTONE**, *Senior Judge*

Pending before the court in this post-award bid protest is plaintiff Iron Bow Technologies, LLC's ("Iron Bow") motion for a temporary restraining order and preliminary injunction pursuant to 28 U.S.C. § 1491(b), Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC"), and Appendix C § V of the court's rules.  In its post-award bid protest filed on May 4, 2017 Iron Bow challenges the United States Marine Corps, Marine Corps Systems Command's ("Marine Corps") award of a two-year firm-fixed-price contract to defendant-intervenor Alamo City Engineering Services, Inc. ("ACES") under solicitation no. M67854-16-R-4001 ("the solicitation"). The purpose of the contract is to provide computer security hardware and related services to the Marines Corps in order to address known security vulnerabilities in the Marine Corps' secure and unsecure computer networks.

In its motion, Iron Bow contends that the court should preliminarily enjoin the award to ACES on the grounds that it is likely to succeed on the merits of its challenges to the Marine Corps' rating of Iron Bow's technical approach as "marginal" and the agency's failure to determine that Iron Bow's proposed price was reasonable for performing the contract in accordance with its proposal.  Iron Bow argues that these errors led to an improper best value determination and an improper contract award to ACES.  Iron Bow further argues that it will suffer irreparable harm if preliminary relief is not granted and that the balance of equities and public interest favor a preliminary injunction.

The government argues that Iron Bow's motion should be denied on the grounds that Iron Bow is not likely to succeed on the merits of its bid protest.  The government

contends that the agency properly evaluated Iron Bow's technical approach and proposed price in accordance with the requirements of the solicitation and detailed discussions. The government also argues that Iron Bow will not suffer irreparable harm if preliminary relief is not granted and that the equities and public interest balance in favor of allowing the contract with ACES to continue.  The government explains that because the contract has a test phase and because *****, Iron Bow will be able to continue the contract if the award is set aside.  The government further argues that the balance of hardships and the public interest weigh against granting Iron Bow's request for preliminary relief on the grounds that fixing the Marine Corps' network vulnerabilities is critical to the Marine Corps' mission.  In support of its position, the government provides declarations from Eric L. Garneski, who was the Marine Corps' Network Access Control, Compliance, and Remediation ("NACCR") Project Engineering Technical Lead and source selection evaluation board chair for this procurement, dated May 8, 2017, and Jennifer J. Glenn, the contracting officer, dated May 8, 2017.  Mr. Garneski explains in his declaration that because of the nature of the network, which stretches from "*****" and the "nature of modern-day computer exploits," timely performance under the contract is essential. According to Mr. Garneski, any delay "would be detrimental to the security" of the network because *****.  Declaration of Eric L. Garneski, May 8, 2017 ("Garneski Decl.") at ¶¶ 3-9.  Ms. Glenn also states in her declaration that contract performance "is extremely time sensitive" and that "any delay in the implementation . . . would be detrimental to national security."  Declaration of Jennifer J. Glenn, May 8, 2017 ("Glenn Decl.") ¶ 18.

3

For the reasons below, the court finds that Iron Bow is unlikely to succeed on the merits and will not suffer irreparable harm if preliminary relief is not granted. In addition, the court finds that the balance of hardships and public interest weigh strongly against preliminary relief in this case. Therefore, Iron Bow's motion for a temporary restraining order and preliminary injunction is **DENIED**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.     Urgent Need Statement and Solicitation

On August 19, 2015, Major General Daniel O'Donohue, Marine Corps Cyber Command, certified an urgent universal need statement for "network access control" hardware and services to mitigate "a network security vulnerability that leaves all commanders at risk of mission failure." AR 1-8. The urgent universal need statement asserted that "Recent classified attacks and compromises are well documented and could have been prevented if C2C was implemented. *****." AR 4, 5.

In April 2016, the Marine Corps issued an urgent statement of need for Network Access Control, Compliance, and Remediation with a "process for executing rapid cyber acquisition." AR 10. In response, the Marine Corps issued the subject solicitation on September 20, 2016. AR 158-1106; Glenn Decl. ¶¶ 3-5. The solicitation explained that the effort would include a prototype testing phase, an integration phase, training, and follow-on annual lifecycle sustainment support. AR 178-200 (original performance work statement), 791-814 (amendment no. 1), 1019-41 (amendment no. 3). The solicitation included thirty-five contract line items. AR 160-77, 1098-99. Contract line item number 1 was for PAC/ Initial Design. AR 1099. Contract line item number 2 was for

NIR/System Final Design.  *Id.*  Contract line item number 3 was for Program

Management.  Contract line item numbers 4 through 11 were for Facility Assessment.  *Id.*

Contract line item numbers 12 through 19 were for Installation/Testing/Operator

Training.  *Id.*  Contract line item numbers 20 and 21 were for System Administration

Training.  *Id.*  Contract line item numbers 22 through 29 were for Design.  *Id.*  Contract

line item numbers 31 and 32 were for Warranty and Maintenance.  *Id.*  Contract line item

number 33 was for deliverables on the "Contract Data Requirements List."  AR 176,

1038-41.  Contract line item numbers 34 through 36 were for Lifecycle Sustainment and

Support.  AR 1099-1100.[1]

The solicitation stated that the Marine Corps intended to award a single Firm-

Fixed-Price, Indefinite Delivery Indefinite Quantity ("IDIQ") contract to an offeror

whose proposal was technically acceptable, whose offer was deemed responsive to the

solicitation requirements, and whose overall offer represented the "best value" to the

government.  AR 1091.

The solicitation required each offeror to submit "[a] concise and comprehensive

proposal."  AR 1077.  The solicitation provided that "[o]rganization, clarity, accuracy of

information, relevance, and completeness are of prime importance."  *Id.*  Proposals

needed to be "complete and clear in all respects without the need for additional

explanation or information."  *Id.*  The solicitation required that each proposal "provide

---

[1] Contract line item number 30, for NAC hardware and initial warranty, was deleted.  AR 174, 1074, 1098-1100.

sufficient detail and scope to permit the Government to evaluate it with respect to the

evaluation factors specified in the Evaluation Criteria of this solicitation." *Id.*

The solicitation cautioned offerors "against general, vague, or unsubstantiated

statements, which prevent or render difficult the Government's evaluation of the

proposal." *Id.* The solicitation provided that "[t]he Government will not assume that an

Offeror possesses any capability, understanding, and/or commitment that is not

specifically delineated and supported in its respective proposal." *Id.* The solicitation also

required offerors to "[e]nsure each section of the proposal adequately contains all the

information necessary for evaluation." AR 1084.

The solicitation identified five evaluation factors: (1) technical approach, (2)

management approach, (3) past performance, (4) price ("evaluated but not rated"), and

(5) small business participation. AR 1091.

With regard to the Marine Corps' evaluation of offerors' technical approaches, the

solicitation stated that the agency would evaluate six elements: (1) ability to execute, (2)

representative configuration, (3) requirements evaluation matrix, (4) contractor work

breakdown structure, (5) quality assurance program plan, and (6) sustainment. AR 1092;

*see also* AR 1084-86 (instructions to offerors regarding submission of technical

approaches).

The solicitation stated that the Marine Corps would evaluate "all documents

submitted in accordance with Attachment 1- Instruction to Offerors" to determine

whether the proposed technical approach "fully addresses each of the Government's

stated [performance work statement] objectives and provides a detailed, comprehensive,

well-articulated, reasonable, understandable, feasible/realistic approach that can be

implemented within the stated parameters."  AR 1092.  The agency would also evaluate

proposals "to determine whether the information provided demonstrates an understanding

of the existing network environment and [performance work statement] requirements."

*Id.*[2]

---

[2] With regard to the technical evaluation rating process, the solicitation stated that the agency would assign technical ratings to "reflect[] the degree to which the proposed approach meets or does not meet the solicitation's requirements through qualitative assessment of a proposal's strength, weaknesses, significant weaknesses, deficiencies, omissions and/or risks."  AR 1093. A rating of "Outstanding" meant that the "Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low," which in turn meant that the "Proposal may contain weakness (es) which have little potential to cause disruption of schedule, increased costs or degradation of performance.  Normal contractor effort and normal government monitoring will likely be able to overcome any difficulties."  AR 1093-94.  A rating of "Good" meant that the "Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate," which in turn meant that the "Proposal contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close government monitoring will likely be able to overcome difficulties."  *Id.*  A rating of "Acceptable" meant that the "Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate."  *Id.*  A rating of "Marginal" meant that the "Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high," which in turn meant that the "Proposal contains a significant weakness or combination of weakness which is likely to cause significant disruption of schedule, increased cost or degradation of performance. Is unlikely to overcome any difficulties, even with special contractor emphasis and close government monitoring."  *Id.*  The solicitation stated that the agency "does not intend to award to any Offeror whose proposal is evaluated as 'Marginal' or lower for any factor."  AR 1093.  A rating of "Unacceptable" mean that the "Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable" which in turn meant that the "Proposal contains a material failure or a combination of significant weakness that increases the risk of an unsuccessful performance to an unacceptable level."  AR 1093-94.  The solicitation stated that a proposal rated unacceptable would be "unawardable."  AR 1093.

The solicitation required offerors to include in their technical proposals a contractor work breakdown structure with an "appropriate level of detail to provide the Government the ability to understand how the Offeror intends to manage the proposed effort with visibility of tasks, activities, schedule, and list of deliverables." AR 1085. Offerors needed to identify in the contractor work breakdown structure "the number of personnel assigned to each task by labor category." *Id.* The solicitation further directed offerors to include an initial staffing plan that "provides personnel with the requisite skills, experience, and qualifications to complete the requirements" of the solicitation. AR 1086.

With regard to pricing, the solicitation required offerors to include price information by contract line items. AR 1087 (Part IV Section 1, as amended). The solicitation stated that:

> The Basis of Estimate (BOE) shall include labor categories, labor descriptions, labor hours, and travel. The proposal narrative, initial staffing plan, and BOE must use identical terminology to describe labor categories. Each labor category must clearly state what company the personnel are from (i.e. OEM, Offeror, or Other subcontractor). The Offeror shall provide a priced Bill of Material (BOM) for all hardware/software licenses by location and enclave (i.e. NIPR/SIPR). The BOM and BOE shall be entered on the spreadsheet file, Attachment_3_Of_52.212-1.xls. The BOM and BOE shall be included in the Price proposal. Price proposal shall be entered on the spreadsheet file, Attachmnet_3_Of_52.212-1.xls, readable in Microsoft Office Excel format. Offerors shall not alter the format of the spreadsheets except that column(s) and row(s) may be widened or added as needed. The contracting officer must be able to determine that all aspects of the requirements have been considered in the proposal and that the price is reasonable for the work required.

AR 1087. Under the heading "Ground Rules and Assumptions," the solicitation required offerors to explain in the price volume "[a]ny inconsistency between promised

performance, the technical proposal, identified personnel resources and cost/price." AR

1087. The solicitation stated that prices would be "evaluated, but not rated." AR 1096.

The contracting officer would perform a price proposal analysis to determine whether the

price was "fair and reasonable." *Id.* The contracting officer reserved the right to reject

an offer if it was determined that unbalanced pricing posed an unacceptable risk to the

government in accordance with FAR § 15.404-1(g). *Id.* In addition, the solicitation

provided that "[t]he proposed price to the Government must be compatible with the

technical portion of the offer." AR 1096. The solicitation stated that "[t]he Government

intends to make a determination of fair and reasonable pricing on the basis of adequate

competition. However, in accordance with FAR 15.404-1, the government may use any

of the analytical techniques in that section, either alone or in combination with each

other, to determine that the award price is fair and reasonable." *Id.*

### B.    Proposals, Evaluation, and Source Selection Decision

The Marine Corps received initial proposals on October 20, 2016. AR 1107-1885.

Following a price evaluation and a small business evaluation, which were completed on

November 18, 2016, and a technical evaluation and a past performance evaluation, which

were completed on November 30, 2016, the Marine Corps found that due to the number

of deficiencies and weaknesses none of the original proposals, including Iron Bow's

proposal, was acceptable for an award. AR 1908-70 (Technical and Past Performance

Evaluation Report), 1986-89 (Business Clearance Memorandum, Dec. 1, 2016). The

agency conducted the first round of discussions from December 1, 2016 through

December 21, 2016.  AR 2009-12 (first round discussion letters), 2013-56 (responses), 2066-2114 (requests for final proposal revisions and discussions).

In the second round of proposals, referred to as the "first final proposal revisions," or "FPR," the Marine Corps again found that each revised proposal, including Iron Bow's proposal, was "unacceptable."  AR 2930 (Technical and Past Performance Evaluation – FPR1, Feb. 1, 2017).  The Marine Corps conducted the second round of discussions from February 3, 2017 through February 10, 2017.  AR 2961-66 (second round discussion letters), 2967-95 (requests for second final proposal revisions and discussions).

In its request for Iron Bow's second final proposal revision, the Marine Corps stated: "You may revise any portion of your original proposal.  However, you are encouraged to limit your changes to those areas addressed in discussions; areas already found acceptable but subsequently changed per your FPR could be found unacceptable during final evaluations."  AR 2986.  The Marine Corps' letter also stated: "[s]hould you revise any portion of your original proposal, you must follow the directions below [referring to submission criteria in the request for proposals, or "RFP"] and in the RFP Amendment 0005 (Enclosure 2), and submit a complete FPR that includes all the information described in this letter and the accompanying enclosures."  *Id.*

In its discussions with Iron Bow leading up to the second final proposed revision, the Marine Corps raised a number of comments regarding Iron Bow's "ability to execute" the requirements of the performance work statement, in particular with regard to Iron

Bow's "basis of estimate" and the labor hours Iron Bow had proposed for the various

contract line items.  AR 2988.[3]

Two sets of comments are relevant to this case.  In the first set of comments, with

regard to the system-level engineering document package (section 3.2.2 of the

performance work statement) and Iron Bow's basis of estimate, the agency identified a

weakness in Iron Bow's first final proposal revision that "the BOE includes labor

categories that are not defined in the narrative."  *Id.*  The agency requested that Iron Bow

"provide labor categories that are consistent with the BOE and narrative section of the

proposal (Part 2 Section 2 Staffing Plan)."  *Id.*  Iron Bow responded that it would "add

the LCAT 'Engineer Level 1' to the narrative of Part II Section 2."  *Id.*  Iron Bow also

stated that it had "reviewed both Part II Section 2 and our BOE from the last submission

and other than 'Engineer Level 1' show the same LCATs."  *Id.*  Iron Bow asked whether

the agency could "point to any other instance that Iron Bow's LCATs do not match our

BOE?"  *Id.*  In response, the agency asked Iron Bow to update its final proposal revision

"so that [it] is consistent between the BOE and narrative section of Part II Section 2,

Initial Staffing Plan that includes all LCATs being proposed including OEM support

personnel."  *Id.*  The agency explained that "[a]n example of inconsistent proposal

information is the narrative provided in Part 2 Section II: 'This will include the following

---

[3] The evaluation notice also stated: "Information provided in this document cannot be used by the Government to determine if RFP requirements have been met.  All information must be submitted in a proposal (or FPR), in the proper format, to be evaluated by the Government."  AR 2988.

roles: Project Manager, Lead Engineer, ForeScout Architect, and Information Assurance Lead.' but the Lead Engineer and ForeScout Architect are not addressed in the 'labor category/prerequisites' table." *Id.*

In the second set of comments, with regard to Iron Bow's basis of estimate and price proposal, the agency identified a weakness in Iron Bow's first final proposal revision that "labor hours and durations for CLINS 0004 through 0011 are underestimated for the scope of facility assessments." *Id.* The agency further stated that "Labor hours for CLINS 0012 through 0019 are underestimated *****" and that "Labor hours for CLINS 0024, 0025, 0027, and[]0029 are underestimated *****." *Id.* The agency requested that Iron Bow provide an "updated technical approach to support their staffing plan as it relates to their proposed scope of facility assessment, design, and integration." *Id.* Iron Bow provided the following response:

> The Iron Bow Team has extensive experience scoping and delivering services of this magnitude and feel we proposed a LoE that has accounted for the necessary services to successfully complete the tasks required. We scoped CLINS 0001 & 0002 with much of the needed PS Labor since this will be the initial phase of the project and likely the most challenging while allowing for reduced/eliminated redundancies and built economies of scale into the CLINS in question. We are confident we had proposed a LoE that would provide for a successful project assessment, design and integration with qualified personnel.
>
> With over a decade of successful delivery of firm-fixed price services to the Government, Iron Bow is confident that the team we have compiled is capable of delivering successfully to this requirement. Our company's financial strength ***** provides the Government with the assurance that we will stand behind our proposal. We commit that we will provide what is required for successful completion of this project. We welcome any additional clarification to the requirement and will adjust our response to increase your confidence in Iron Bow.

*Id.* The Marine Corps then provided the following response:

> The Government acknowledges and requests that the Offeror update its FPR BOE as necessary.
>
> **Provided for informational purposes only:** The Government anticipates the labor needed for Facility Assessment, Design, and Install/Test/Doc to be divided up 10%, 30%, 60% respectively. **Offerors are NOT required to use this labor distribution.[4]**

*Id.* With regard to the "Price Proposal Requirement (RFP page 60)" the discussion document stated "See 'Technical' Tab for issues related to the BOM and BOE." AR 2994.[5]

The Marine Corps received second final proposal revisions, including Iron Bow's second final proposal revision, on February 16, 2017. AR 2996-3607. Evaluations were completed on February 24, 2017. AR 3611.

In its technical evaluation report, the technical evaluation team upgraded its rating of Iron Bow's technical proposal from "unacceptable" to "marginal." AR 3624. The technical evaluation team identified one "significant weakness" related to Iron Bow's "ability to execute" the requirements of the solicitation. AR 3625. The technical

---

[4] The instructions to offerors, as amended, also stated that "Only proposal sections that have been updated/changed need to be submitted for re-evaluation." AR 1080.

[5] In its discussion with ACES leading up to the second final proposal revision, the government identified one weakness regarding ACES' ability to execute the requirements of the performance work statement related to the basis of estimate. The government stated that "CLINs 0016, 0018, 0026, 0028 for design and integration are excessive in labor hours *****." AR 2969. The government requested that ACES update its "technical approach to support their staffing plan as it relates to their proposed scope of design and integration." *Id.* ACES concurred but noted that it "*****." *Id.* ACES explained that "*****." *Id.* ACES added that "*****." *Id.* The agency acknowledged ACES response and asked ACES "to update its FPR as detailed in the 'FPR 1 Contractor Response' to reflect the ***** required for *****." *Id.*

evaluation team noted that in the second round of discussions, the agency had requested that Iron Bow substantiate hours associated with certain design and integration activities (contract line item numbers "0012-0019 and 0024, 0025, 0027 and 0029") which appeared to have been underestimated for certain regions.  *Id.*  The technical evaluation team found that despite Iron Bow's response to comments explaining that Iron Bow stood behind its proposal, Iron Bow had increased its labor hours associated with the design and integration contract line items by ***** from its original proposal.  AR 3625-26. The technical evaluation team noted that Iron Bow had not updated its technical approach to account for these changes.  *Id.*

The technical evaluation team also noted that Iron Bow had not identified ***** labor in any of the contract line items for design, as described in the performance work statement and associated contract data requirements list.  AR 3626.  The technical evaluation team also found that Iron Bow's technical proposal "included ***** in Integration despite the proposed staffing plan having outlined *****."  *Id*.

The technical evaluation team also questioned Iron Bow's decision to increase proposed labor hours for sustainment activities (contract line item numbers 0034, 0035, and 0036) by ***** even though the labor hours for sustainment activities had not been identified as problematic in Iron Bow's first final proposal revision and thus not raised in discussions.  AR 3626.  According to the technical evaluation team, this meant "Iron Bow proposed ***** of the total labor to sustainment activities versus ***** of labor hours for the complex systems integration."  *Id.*  The technical evaluation team concluded that because Iron Bow had increased the labor hours in its basis of estimate without

updating its technical approach to substantiate or account for those changes, the

evaluation team "was unable to determine the reasonableness of the proposed labor hours

as they would apply to the technical approach, and determined that this introduces a high

level of risk of unsuccessful performance of the proposed design and integration, and

sustainment activities." *Id.* The technical evaluation team found that "[b]y not proposing

either adequate or substantiated labor hours for design and integration or sustainment

activities, this jeopardizes a successful implementation of the proposed solution to meet

the urgency of this requirement." *Id.*

The price evaluation team found that Iron Bow's price calculations were

"complete and accurate." AR 3650. However, the price evaluation team stated that it

could not determine that Iron Bow's total contract price was reasonable for performing

the contract in accordance with Iron Bow's technical proposal. *Id.* In particular, the

price evaluation team stated that Iron Bow's second final proposal revision "contained

excessive labor hours for Lifecycle and Sustainment that were not supported in its

technical approach; therefore, the total contract price could not be determined

reasonable." AR 3651.

As documented in a source selection decision memorandum dated March 20,

2017, the source selection authority determined that ACES, which had received a rating

of "good" for its technical proposal, provided the best value to the government for the

subject solicitation. AR 3669-91. The source selection authority rated Iron Bow's

technical approach "marginal" for the same reasons the technical evaluation team had

identified. AR 3683-85. The source selection authority also found that Iron Bow's

proposed price could not be determined reasonable based on the evaluation teams'
findings of "a significant weakness/issues relating to the technical approach and
inconsistencies between the technical approach and the [basis of effort]." AR 3686.[6]

### C.     Award and Debriefing

The Marine Corps awarded the contract to ACES on March 22, 2017. AR 3716.
On March 23, 2017, the Marine Corps informed Iron Bow that it had not been selected
for an award. AR 3714. The letter stated that ACES had proposed a technically superior
proposal for the procurement and that the Marine Corps had identified issues regarding
Iron Bow's "proposed distribution of labor hours, which were identified during
discussions." *Id.* The agency stated that although Iron Bow had adjusted its labor hours
in the second final proposal revision, "Iron Bow further assigned ***** of the labor
hours to the sustainment phase and ***** labor hours for the design and integration
phases." *Id.* The agency found that "[t]his mix of labor and overall technical approach
introduced an elevated risk of unsuccessfully meeting all of the requirements of this
urgent-needs procurement." *Id.* Therefore, the letter stated, the Marine Corps rated Iron
Bow's technical proposal "marginal" and the proposal "was therefore unawardable in
accordance with the terms of the RFP." *Id.* With regard to price, the letter stated that the
agency could not determine that Iron Bow's proposed price was reasonable "in view of
the noted disparity between the proposed labor hours and [basis of estimate]." *Id.*

---

[6] The source selection authority found that ACES' explanation in its discussion comments that
"*****" resolved the weakness related to the agency's concern that ACES had proposed *****.
AR 2678.

On March 31, 2017, the Marine Corps provided Iron Bow with a written

debriefing pursuant to FAR § 15.506.  AR 3808-11.  The March 31, 2017 debriefing

repeated discussion comments[7] and the findings from the technical evaluation team, price

evaluation team, and the source selection authority with regard to the agency's ratings for

Iron Bow's technical and price proposals.  AR 3809-10.  The agency acknowledged that

Iron Bow's proposal received ratings of "satisfactory" for past performance, "acceptable"

for small business participation, and "acceptable" for management factor.  *Id.*  However,

the Marine Corps found that because Iron Bow's proposal received an overall rating of

"marginal" for its technical approach, with no strengths, no deficiencies, no weaknesses,

and one significant weakness, the proposal was unawardable under the terms of the

solicitation.  AR 3810-11.  The Marine Corps noted that the solicitation had provided that

"[t]he Government does not intend to award to any Offeror whose proposal is evaluated

as "Marginal" or lower for any factor;" and "[t]he proposed price to the Government

---

[7] With regard to the discussion comments, the debriefing stated that "[d]uring the second round of discussions, the Government requested, among other things, that Iron Bow substantiate hours associated with CLINS ***** for proposed design and integration activities."  AR 3809.  The debriefing further stated that "[i]t was the Government's conclusion during FPR-1 that a weakness existed as the labor hours associated with these CLINs appeared to be underestimated ***** based on *****."  *Id.*  The debriefing noted that "[t]he Government requested that Iron Bow update its technical approach to substantiate its position and mitigate these concerns" and that "Iron Bow responded by stating that they '. . . have over a decade of successful delivery of firm-fixed price services to the Government . . . and we will stand behind our proposal.'"  *Id.*  The debriefing continued that "[t]he Government further provided to all Offerors in the second round of discussions that the expectation for the integration effort was envisioned to occupy approximately 60% of the total labor being proposed; however, Offerors were not required to propose to that percentage."  *Id.*

must be compatible with the technical portion of the offer."  AR 3811.  The agency also
noted that it had not used a ranking system during the source selection.  *Id.*

### D.      GAO protest

Iron Bow filed a bid protest before the Government Accountability Office
("GAO") on April 4, 2017, challenging the award decision on the grounds that the
Marine Corps' technical evaluation was not supported.  AR 3841.  The Marine Corps
issued a stop work order to ACES on April 5, 2017.  Glenn Decl. ¶ 13.  GAO dismissed
the protest on April 27, 2017 on the grounds that Iron Bow was not an "interested party."
AR 3885-87.  Specifically, the GAO found that because Iron Bow failed to expressly
challenge the Marine Corps' evaluation of its price, which was another basis upon which
its proposal was determined unawardable, Iron Bow lacked the requisite interest to
challenge other aspects of the agency's evaluation.  AR 3886-87.  The Marine Corps
rescinded the stop work order on April 28, 2017.  Glenn Decl. ¶ 13.

### E.      Protest before this Court

Iron Bow filed its complaint in this court on May 4, 2017 challenging both the
Marine Corps' technical evaluation and price evaluation of its proposal.  Along with its
complaint, Iron Bow filed the pending motion for a temporary restraining order and
preliminary injunction (ECF No. 5).  ACES filed its motion to intervene on May 5, 2017
(ECF No. 12) and the court granted the motion at the status conference held that day.

The government filed its response to Iron Bow's motion for preliminary relief on
May 8, 2017 (ECF No. 19).  As noted above, the government supported its response with
declarations from Eric L. Garneski, who was the Marine Corps' NACCR Project

Engineering Technical Lead and source selection evaluation board chair for this procurement, dated May 8, 2017, and Jennifer J. Glenn, the contracting officer, dated May 8, 2017.  ACES filed its response on May 9, 2017 (ECF No. 21).  ACES provided a declaration by Craig T. Stephens, President and CEO of ACES, dated May 9, 2017.  The government filed the administrative record on May 10, 2017 (ECF No. 23) and a correction and amendment to the administrative record were made on May 17, 2017 (ECF Nos. 26, 27).  Iron Bow filed its reply in support of its motion for a temporary restraining order and preliminary injunction on May 10, 2017 (ECF No. 24).

The court heard oral argument on Iron Bow's motion for a temporary restraining order and preliminary injunction on May 12, 2017.

## II.    JURISDICTION AND LEGAL STANDARD

This court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).[8]  In addition, the court may award "any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  *Id.* at § 1491(b)(2); *see also*

---

[8] There is no dispute that Iron Bow has standing to bring this bid protest.  Iron Bow was an "interested party" as an actual bidder with a direct economic interest in the procurement, on the grounds that it had a substantial chance of winning the contract at issue, and was prejudiced by an alleged significant error in the procurement process.  *Diaz v. United States*, 853 F.3d 1355, 1358-59 (Fed. Cir. 2017) (citations omitted).

RCFC 65, App. C § V (providing procedures for requesting a preliminary injunction or a temporary restraining order).

　　While the court may grant preliminary injunctive relief, it is well-settled that "a preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  To obtain a preliminary injunction, a plaintiff must show (1) "a likelihood of success on the merits"; (2) that it "will suffer irreparable harm if the court withholds injunctive relief"; (3) that "the balance of hardships to the respective parties favors the grant of injunctive relief"; and (4) that "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).[9]  In this connection, this court must "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  28 U.S.C. § 1491(b)(3); *see also Winter*, 555 U.S. at 24 (giving "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" where the case involved "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments.'" (citations omitted)).

---

[9] Because the court has before it a motion for a preliminary injunction, Iron Bow's application for a temporary restraining order has been subsumed into its motion for a preliminary injunction. *See, e.g.*, *EOD Tech., Inc. v. United States*, 82 Fed. Cl. 12, 19 (2008).

### III.   DISCUSSION

### A.   Iron Bow is Not Likely to Succeed on the Merits

### 1.   Standard of Review in Bid Protests

This court reviews protests of agency procurement decisions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (citing 28 U.S.C. § 1491(b)(4)).  "[A]n agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  "A court 'must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.'"  *Id.* (quoting PAI *Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)).

### 2.   Technical evaluation

The Marine Corps determined that Iron Bow's technical proposal was marginal based on its finding of a "significant weakness" related to Iron Bow's failure to substantiate changes to labor hours for design and integration activities, proposing a significant but unexplained increase in hours for sustainment activities, and failing to include labor hours for a Cyber Security Engineer in design activities.

This court grants great deference to an agency's technical evaluations.  *See L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008); *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003).  The court has found that "[t]he evaluation of proposals for their technical excellence or quality is a process that often

requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

Iron Bow argues the agency's finding that it failed to substantiate or account for changes to labor hours for design and integration activities was irrational on the grounds that Iron Bow's changes were consistent with and made in response to the agency's discussion comments.  Iron Bow argues that it "substantiated" the hours in its basis of effort by describing how labor hours would be allocated by contract line item number, site location, and labor category.  Iron Bow also argues that the agency's comment that Iron Bow failed to "substantiate" its changes in hours is based on an improper reliance on the parties' discussions as opposed to the evaluation criteria stated in the solicitation.[10] Iron Bow argues that the agency "essentially directed" Iron Bow's changes to its proposal based on the agency's anticipated labor mix and that it added hours to meet the

---

[10] Iron Bow also argues that given the agency's reliance on Iron Bow's comments in the discussion document in its evaluation, it is "entirely probable" that the agency likewise failed to evaluate ACES's proposal solely on the contents of its written proposal and, instead, relied on ACES's discussion comments.  Iron Bow argues that this would be contrary to the terms of the solicitation and an additional ground to set aside the award to ACES.  As noted above, the source selection authority found that ACES' explanation in its discussion comments that "*****" resolved the weakness related to the agency's concern that ACES had proposed excessive labor hours associated with design and integration.  AR 2678.  There is no analysis in the briefs and no indication in the record that ACES, like Iron Bow, significantly revised its basis of estimate or hours without updating its technical proposal.  *See also* AR 2198-2203 (ACES' basis of estimate for its first final proposed revision), 3195-97 (ACES' basis of estimate for its second final proposed revision), 3248-77 (redline of ACES' technical approach in its second final proposed revision).

government's statement in its comments that it "anticipates the labor needed for Facility

Assessment, Design, and Install/Test/Doc to be divided up 10%, 30%, 60% respectively."

AR 2988.  Iron Bow argues that it increased hours to meet the agency's anticipated

allocation *****.

With regard to the agency's comments about its proposed hours for sustainment

activities, Iron Bow explains that it noticed an error in its earlier proposal that the hours

for sustainment contract line item numbers 34 and 35 were based on a 12-month ordering

period and the hours for sustainment contract line item number 36 were based on a 24-

month ordering period.  Iron Bow states that it adjusted the hours for sustainment in its

second final proposal revision by doubling the hours for contract line item number 36 and

that proper hours for the first final proposal revision would be equivalent.  Iron Bow

concedes, however, that it did not explain this change in its second final proposal

revision.  With regard to the agency's findings regarding Iron Bow's proposed *****

hours, Iron Bow argues that if the agency had a serious concern about Iron Bow's

proposed ***** hours in design or integration, then the agency was required to raise that

concern with Iron Bow during discussions.

The court agrees with the government that Iron Bow is not likely to succeed on the

merits of its claim that the Marine Corps' decision to rate Iron Bow's technical approach

as "marginal" is not supported.  Iron Bow received the "marginal" rating largely because

it changed the basis of estimate for its proposed price without updating its technical

approach in the second final proposal revision to explain the changes in hours.  As the

government highlights in its response to Iron Bow's motion, the solicitation required

offerors to "[e]nsure each section of the proposal adequately contains all the information necessary for evaluation." AR 1084. The solicitation required proposals to be "complete and clear in all respects without the need for additional explanation or information," and "provide sufficient detail and scope to permit the Government to evaluate it with respect to the evaluation factors specified in the Evaluation Criteria of this solicitation." AR 1077. Offerors were directed not to use "general, vague, or unsubstantiated statements" because such statements "prevent or render difficult the Government's evaluation," and that an incomplete response, "without supporting narrative to describe approach or detail compliance" would "rarely be acceptable." *Id.* The solicitation likewise informed offerors that the "Government will not assume that an Offeror possesses any capability, understanding, and/or commitment that is not specifically delineated and supported in its respective proposal." *Id.* When Iron Bow changed the labor hours in its second final proposal revision, Iron Bow was required under the terms of the solicitation to explain that change in its technical approach and did not. In addition, Iron Bow did not indicate that it intended to make changes to these hours in its discussions with the agency. AR 2988. The court agrees with the government that Iron Bow could not assume that the agency would understand why Iron Bow made these changes. *Id.* The solicitation required proposals to be complete, understandable, and provide sufficient support. *Id.* Thus, Iron Bow is not likely to succeed in its challenge to the agency's questioning Iron Bow's unexplained changes to its hours for facility assessment, design, and testing.

The court also agrees with the government that the discussions, which Iron Bow concedes were "detailed," Pl. Reply at 3, were not incomplete or misleading. According

to the technical evaluation report, Iron Bow's proposal's sustainment contract line items "(0034-0036) were not identified as a concern during FPR-1 and not included as part of the discussion process."  AR 3626.  Therefore, the agency had no way of knowing why the hours were ***** in Iron Bow's second final proposal revision.

Finally, with regard to Iron Bow's contention that the agency's criticism of Iron Bow's Cyber Security engineering hours was irrational because the issue was not raised in the discussions, the court finds that to the extent the matter should have been raised in discussions the error is harmless given the fact that the agency's serious concerns with Iron Bow's additional unexplained hours alone would likely support a marginal rating.

For all of these reasons the court finds that Iron Bow is not likely to succeed on the merits of its challenge to the "marginal" technical rating it received.

### 3.    Price evaluation

Iron Bow challenges the Marine Corps' evaluation of its proposed price on the grounds that the Marine Corps did not follow the solicitation's instructions.  Iron Bow argues that the solicitation stated that the "[g]overnment intends to make a determination of fair and reasonable pricing on the basis of adequate competition" but that the agency did not compare Iron Bow's price to the competition or the agency's own estimates.  In addition, Iron Bow argues, the agency's views on Iron Bow's technical proposal are irrelevant to determining whether Iron Bow's cost proposal was "compatible with the technical portion of the offer."  Iron Bow asserts that the agency determined that its calculations were "complete and accurate."  AR 3650.  Iron Bow argues that a price can be compatible with a technical proposal even if that technical proposal is flawed.  Finally,

Iron Bow argues that the agency's evaluation of Iron Bow's price was unjustified on the grounds that the agency's only basis for determining that Iron Bow's price was not reasonable was the agency's allegedly irrational evaluation of Iron Bow's technical proposal.  Iron Bow asserts that had the agency conducted a proper technical evaluation, the agency would have determined that Iron Bow's price was reasonable.

The court agrees with the government that Iron Bow is not likely to succeed on its challenge to the Marine Corps' price evaluation.  The Marine Corps concluded that it could not determine based on the information that Iron Bow provided whether Iron Bow's price was reasonable.  The solicitation directed offerors to include in their price volume a basis of estimate that "include[d] labor categories, labor descriptions, labor hours, and travel" for each contract line item number.  AR 1087.  The solicitation required offerors to provide sufficient information to allow the Government "to determine that all aspects of the requirements have been considered in the proposal and that the price is reasonable for the work required."  *Id.*  The solicitation also required offerors to explain in the price volume "[a]ny inconsistency between promised performance, the technical proposal, identified personnel resources and cost/price."  *Id.*  Finally, as acknowledged by Iron Bow, the solicitation notified offerors that the government would evaluate the proposed price and that in order to be deemed "fair and reasonable," the "proposed price to the Government must be compatible with the technical portion of the offer."  AR 1096.

In this case, because Iron Bow did not update its technical approach to substantiate the changes in contract line items, the agency was unable to determine the reasonableness

of the revised sustainment hours and how the revisions corresponded to Iron Bow's

technical approach.  AR 3626, 3649.  The price evaluation team found that Iron Bow's

second final proposal revision "contained excessive labor hours for Lifecycle and

Sustainment that were not supported in its technical approach; therefore, the total contract

price could not be determined reasonable."  AR 3651.  The source selection authority also

found that Iron Bow's proposed price could not be determined reasonable based on,

among other things "inconsistencies between the technical approach and the [basis of

effort]."  AR 3686.  In such circumstances, the court agrees with the government that Iron

Bow is not likely to succeed in showing that the Marine Corps' conclusion that it could

not determine that Iron Bow's price was reasonable was unsupported.[11]

### B.    Iron Bow Cannot Show That It Will Suffer Irreparable Harm if Preliminary Relief is not Granted.

To demonstrate an irreparable injury, a party must establish that without a

preliminary injunction it will suffer irreparable harm before a decision can be rendered on

the merits.  *See, e.g.*, *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 78 (2007).

"A party suffers irreparable harm when there is no adequate remedy at law."  *Id.* (citing

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 575 (2004)).  This court has

---

[11] The government also argues that to the extent that Iron Bow is arguing that the solicitation contained a patent ambiguity with respect to the requirement that an offeror's "proposed price to the Government must be compatible with the technical portion of the offer," Iron Bow's claim is untimely.  The government argues that Iron Bow knew the agency's interpretation of this requirement from two rounds of discussions and that Iron Bow failed to challenge it before bids were due, thus waiving any such objection.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313-15 (Fed. Cir. 2007).  Iron Bow does not respond to this argument in its reply brief and the court does not read Iron Bow's motion as continuing to assert an argument based on ambiguity in the solicitation's instructions or criteria for review of offerors' price proposals.

found that "loss of an opportunity to compete constitutes irreparable harm." *E.g.*, *Red River Commc'ns, Inc. v. United States*, 109 Fed. Cl. 497, 519 (2013) (citations omitted).

Iron Bow argues that without preliminary injunctive relief, it will suffer irreparable harm because if the contract continues it will not be able to recover lost profits it may have received on the contract. Iron Bow asserts that the loss of the contract and the accompanying loss of revenue will be extremely detrimental to Iron Bow's business operations and reputation. Iron Bow further states that it has no adequate remedy at law to be compensated for these losses, and thus, Iron Bow has and will continue to suffer irreparable harm.

In response, the government argues that because the contract has a phased approach and *****, Iron Bow will not lose all contract profits if it were to prevail in the case. Specifically, the government explains that ACES is presently working on the testing and pilot phases, *****. The government argues that the profits on this portion of the contract are small and that if Iron Bow prevails it will be able to step into ACES shoes and continue the contract without much disruption.

The court agrees with the government that Iron Bow has not established that without a preliminary injunction it will suffer irreparable harm before a decision can be rendered on the merits. In light of the government's *****, the court has ample time to resolve the case on the merits before Iron Bow would lose the opportunity to perform the contract at issue. Mr. Garneski and Ms. Glenn state in their declarations that the contract requires ACES to deliver a prototype of the computer hardware to a government laboratory for testing and "accreditation and authorization" to operate on the Marine

Corps Enterprise Network.  Garneski Decl. ¶10; Glenn Decl. ¶ 12(e).  *****.  Glenn

Decl. ¶ 12(e).  This process *****.  *Id.*  In the event that the court sustains Iron Bow's

protest the Marine Corps can furnish Iron Bow with any accreditation and related

documentation generated during this part of contract performance.  *Id.*

Even after the interim accreditation process is complete, ACES cannot proceed

with a full system-wide roll out of the hardware until it successfully completes a pilot

phase involving installation of the hardware at a single location for further testing, *****.

Garneski Decl. ¶10; Glenn Decl. ¶ 12(f).  The deployment of the hardware to the

remaining portions of the network will occur *****.  Glenn Decl. ¶ 12(f).  Therefore,

Iron Bow's financial loss will be limited to whatever profits it might have received from

the delivery and installation of the prototype and the pilot program.  Because Iron Bow

will not be foreclosed from performing the remainder of the contract should it prevail, it

has not demonstrated that it will suffer irreparable harm.[12]

### C.       The Balance of Hardships and Public Interest Weigh Against an Injunction.

As noted above, this court must "give due regard to the interests of national

defense and national security and the need for expeditious resolution of the action."  28

U.S.C. § 1491(b)(3).  This court also gives "great deference to the professional judgment

of military authorities concerning the relative importance of a particular military interest"

---

[12] Because the court finds that Iron Bow will not suffer irreparable harm if preliminary relief is not granted, the court does not reach the government's argument that Iron Bow's week-long delay before filing this action after the GAO dismissed its protest undermines its pending motion.  *See Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88, 99 (2010).

where the case involved "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments.'" *Winter*, 555 U.S. at 24 (citations omitted).

Iron Bow argues that the government will suffer minimal or no harm while a preliminary injunction is in place because performance of the contract has not yet started. Iron Bow also notes that during the GAO protest, the Marine Corps did not attempt to override the CICA "stay" provision, which Iron Bow asserts confirms the relative lack of urgency. Iron Bow further contends that ACES' financial interests are protected by the various financial recovery provisions of the contract it currently holds. For example, Iron Bow argues that the contract's termination for convenience clause and ACES' ability to request an equitable adjustment pursuant to the stop work order and the changes clause, if so warranted, protect ACES from financial harm stemming from the pendency of an injunction. Iron Bow also notes that ACES, like Iron Bow, has waited years for this contact. Iron Bow further argues that injunctive relief is in the public interest to prevent the Marine Corps' alleged violations from undermining the integrity of the competitive procurement process and public confidence in that process.

The government argues that given the security issues associated with the contract, the balance of harms and public interest weigh heavily in favor of denying preliminary relief. The government states that delaying performance in this case would result in significant risk to the integrity of the Marine Corps network. Relying on the urgent need statement in the record and Mr. Garneski's declaration, the government asserts that the Marine Corps network is currently "exposed and vulnerable," Garneski Decl. ¶ 7(c), and

until the network vulnerability is mitigated, "all commanders [are] at risk of mission failure," AR 4.  This procurement was commenced as a result of the Marine Corps urgent needs process, which requires a request from a commander for a capability "that is critically needed by operating forces conducting combat or contingency operations" that, if not provided, would likely "result in the inability of units to accomplish their missions or risks increased probability of casualties and loss of life."  Garneski Decl. ¶ 5.b.  The request for an urgent need statement in this case explains that the Marine Corps networks "*****."  AR 4.  The request stated that "*****" connected to the network, and that "*****."  *Id.*; *see also* Garneski Decl. ¶ 7(a)-(d).  As Mr. Garneski explains in his declaration, in offering this procurement competitively, the Marine Corps has, in effect, disclosed the vulnerability of its network, and that time is of the essence in implementing the solution under the contract.  Garneski Decl. ¶ 7(a)-(d).  The government contends that in view of the foregoing, the equities and the public interest clearly balance in favor of the government.

ACES also argues that enjoining contract performance during the pendency of this protest will impose severe hardship upon ACES, which has already started performing the contract.  Craig T. Stephens, President and CEO of ACES, states in his declaration that enjoining contract performance would deprive ACES of reimbursement of substantial compensation for work that it has already performed, prevent ACES from receiving ***** contract payments, and delay salary payments and the provision of employee benefits to the employees that ACES has hired to perform the contract. Stephens Decl. ¶¶ 4-6.  Moreover, Mr. Stephens states, a delay in contract performance

could permanently reduce ACES' profitability because the company from which ACES will purchase equipment to be used for the contract *****.  Stephens Decl. ¶ 7.  The expiration of the ***** could force ACES to purchase equipment using *****, permanently adding millions of dollars in costs to ACES performance.  *Id.*

The court agrees that the balance of equities weighs in favor of denying preliminary injunctive relief.  The Marine Corps network provides services to the entire organization, including "*****."  Garneski Decl. ¶ 3.  Mr. Garneski states in his declaration that "[t]he implementation of this NACCR solution is extremely time sensitive" and "[a]ny delay in the design and implementation of the NACCR solution would be detrimental to the security of the [Marine Corps Enterprise Network]."  Garneski Decl. ¶ 7.  Mr. Garneski explains that the Marine Corps Enterprise Network "*****."  *Id.* at ¶ 7(a).  The solicitation at issue in this case publicized the network's vulnerability.  *Id.* at ¶ 7(b).  According to Mr. Garneski, there are ***** and *****.  *Id.* at ¶¶ 7(c)-(d), 8.  Mr. Garneksi states that "*****" and that the Marine Corps does not *****.  *Id.* at ¶ 7(c).  According to Mr. Garneski, further delaying contract performance "could lead to extremely negative cybersecurity consequences *****."  *Id.* at ¶ 10.

Ms. Glenn also explains in her declaration that "the awarded contract is designed to ensure the NACCR solution is implemented in a methodical but rapid manner."  Glenn Decl. ¶ 14.  Ms. Glenn states that contract performance "is extremely time sensitive" and that "any delay in the implementation . . . would be detrimental to national security."  Glenn Decl. ¶ 18.

Given the national security concerns raised by these declarations the court finds that the limited harm to Iron Bow does not outweigh the harm to the government.  In addition, with an expedited schedule on the merits the court is persuaded that any harm to Iron Bow can be minimized.  Finally, the court finds for the same reasons that the public interest weighs in favor of denying preliminary injunctive relief.

## IV.    CONCLUSION

For the reasons stated above, Iron Bow's motion for a temporary restraining order and preliminary injunction is **DENIED**.

The parties shall have until **June 5, 2017** to propose a schedule for resolving the case on the merits on an expedited basis.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge