# In the United States Court of Federal Claims

No. 17-603C
(Filed: September 14, 2017)*
**\*Opinion originally filed under seal on September 6, 2017**

| | |
|---|---|
| IRON BOW TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ALAMO CITY ENGINEERING<br>SERVICES, INC.,<br><br>Defendant-Intervenor. | Post-Award Bid Protest; Standing;<br>Discussions; Failure to Comply with<br>Solicitation Requirements and Explain<br>Proposal Changes Following<br>Discussions |

*James C. Fontana*, Tysons Corner, VA, for plaintiff. *L. James D'Agostino* and *Jeffry R. Cook*, Tysons Corner, VA, of counsel.

*Robert M. Norway*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Chad A. Readler*, Acting Assistant Attorney General, and *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Steven R. Hall*, Assistant Counsel, Marine Corps Systems Command, Stafford, Virginia, of counsel.

*Richard J. Conway*, Washington, DC, for defendant-intervenor. *Michael J. Slattery*, New York, NY, of counsel.

## OPINION ON CROSS MOTIONS FOR
## JUDGMENT ON THE ADMINISTRATIVE RECORD

**FIRESTONE**, *Senior Judge*

Pending before the court in this post-award bid protest initially filed on May 4, 2017 is plaintiff Iron Bow Technologies, LLC's ("Iron Bow") motion for judgment on the administrative record together with the defendant's ("government") motion to dismiss and cross motion for judgment on the administrative record and defendant-intervenor's (Alamo City Engineer Services, Inc.'s "ACES") cross motion for judgment on the administrative record. (ECF nos. 32,33,34)  At issue is the United States Marine Corps, Systems Command's ("Marine Corps") award of a two-year firm-fixed-price contract to ACES under request for quotations no. M67854-16-R-4001 ("the solicitation").[1]  The purpose of the contract is to provide computer security hardware and related services to the Marine Corps in order to address known security vulnerabilities in the Marine Corps' secure and unsecure computer networks.

On May 23, 2017, the court denied Iron Bow's motion for preliminary injunctive relief.  (ECF no. 28)  Iron Bow filed the pending motion for judgment on the administrative record on June 9, 2017.  (ECF No. 32).  In its motion, Iron Bow contends that the Marine Corps failed to conduct meaningful discussions with Iron Bow. Specifically, Iron Bow alleges that "[t]he [Marine Corps] failed to inform Iron Bow during discussions of at least some significant weaknesses and deficiencies that later formed the basis of Marine Corps' finding that Iron Bow's proposal was unawardable," Pl.'s Reply at 5, and that "[h]ad Iron Bow known of those significant weaknesses and deficiencies, it would have submitted a revised final proposal addressing each of those

---

[1] As discussed *infra*, the government initially questioned whether Iron Bow had standing in their motion to dismiss.  The government and ACES' no longer question Iron Bow's standing. Standing is addressed in the jurisdictional section in the opinion.  Because the court has concluded that Iron Bow has standing, the government's pending motion to dismiss is **DENIED**.

elements." Pl.'s Reply at 6. Iron Bow also contends that some of the Marine Corps' comments during the discussions were misleading in that Iron Bow believed it had addressed the Marine Corps' concerns based on certain comments. Finally, Iron Bow argues that the Marine Corps improperly evaluated Iron Bow's technical proposal by finding fault in the proposal when according to Iron Bow it simply corrected an error. Iron Bow argues based on these contentions that the Marine Corps made an erroneous best value determination and improperly awarded the contract to ACES. The government and ACES both argue that the Marine Corps' discussions with Iron Bow were adequate and not misleading and that the Marine Corps rationally concluded that Iron Bow's proposal had a significant weakness and thus was properly rejected.

For the reasons discussed below, the court finds that the Marine Corps' discussions with Iron Bow were adequate and not misleading and that the Marine Corps rationally rejected Iron Bow's proposal. Therefore, Iron Bow's motion for judgment on the administrative record is **DENIED** and the cross motions of the government and ACES for judgment on the administrative record are **GRANTED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### A.      Urgent Need Statement and Solicitation

On August 19, 2015, Major General Daniel O'Donohue, Marine Corps Cyber Command, certified an urgent universal need statement for "network access control"

---

[2] Many of the background facts were summarized in the court's earlier opinion denying preliminary injunctive relief and are summarized here. *See, Iron Bow Techs., LLC v. United States*, 132 Fed. Cl. 346 (2017).

hardware and services to mitigate "a network security vulnerability that leaves all commanders at risk of mission failure."  AR 1-8.

Thereafter, in April 2016, the Marine Corps issued an urgent statement of need for Network Access Control, Compliance, and Remediation with a "process for executing rapid cyber acquisition."  AR 10.  In response, the Marine Corps on September 20, 2016 sent out the request for proposals which is the solicitation at issue in this litigation.  AR 158-1106; Glenn Decl.  ¶¶ 3-5.  The solicitation explained that the effort would include a prototype testing phase, an integration phase, training, and follow-on annual lifecycle sustainment support.  AR 178-200 (original performance work statement), 790-835 (amendment no. 1), 1018-70 (amendment no. 3).  The solicitation included thirty-five contract line item numbers ("CLINs").[3]  AR 160-77, 1098-99.  CLINs 4 through 11 were for Facility Assessment.  *Id.*  CLINs 12 through 19 were for Installation/Testing/Operator Training.  *Id.*  CLINs 34 through 36 were for Lifecycle Sustainment and Support.  AR 1099-1100.

The solicitation stated that the Marine Corps intended to award a single Firm-Fixed-Price, Indefinite Delivery Indefinite Quantity ("IDIQ") contract to an offeror whose proposal was technically acceptable, whose offer was deemed responsive to the solicitation requirements, and whose overall offer represented the "best value" to the government.  AR 1091.

The solicitation required each offeror to submit "[a] concise and comprehensive proposal."  AR 1077.  The solicitation provided that "[o]rganization, clarity, accuracy of

---

[3] The court will only address those CLINs relevant to the discussion of the merits of this case, including CLINs 12-19 and 34-36.

information, relevance, and completeness are of prime importance." *Id.* Proposals needed to be "complete and clear in all respects without the need for additional explanation or information." *Id.* The solicitation required that each proposal "provide sufficient detail and scope to permit the Government to evaluate it with respect to the evaluation factors specified in the Evaluation Criteria of this solicitation." *Id.*

The solicitation cautioned offerors "against general, vague, or unsubstantiated statements, which prevent or render difficult the government's evaluation of the proposal." *Id.* The solicitation provided that "[t]he Government will not assume that an Offeror possesses any capability, understanding, and/or commitment that is not specifically delineated and supported in its respective proposal." *Id.* The solicitation also required offerors to "[e]nsure each section of the proposal adequately contains all the information necessary for evaluation." AR 1084.

The solicitation required offerors to submit proposals organized into three sections: (1) a technical volume, (2) a price volume, and (3) a small business participation volume. AR 1080.

The solicitation identified five evaluation factors: (1) technical approach, (2) management approach, (3) past performance, (4) price ("evaluated but not rated"), and (5) small business participation. AR 1091. The solicitation explained that the technical approach was the most important factor. *Id.*

With regard to the Marine Corps' evaluation of offerors' technical approaches, the solicitation stated that the agency would evaluate six elements: (1) ability to execute, (2) representative configuration, (3) requirements evaluation matrix, (4) contractor work breakdown structure, (5) quality assurance program plan, and (6) sustainment. AR 1092;

*see also* AR 1084-86 (instructions to offerors regarding submission of technical

approaches).

The solicitation stated that the Marine Corps would evaluate "all documents

submitted in accordance with Attachment 1- Instruction to Offerors" to determine

whether the proposed technical approach "fully addresses each of the Government's

stated [performance work statement or "PWS"] objectives and provides a detailed,

comprehensive, well-articulated, reasonable, understandable, feasible/realistic approach

that can be implemented within the stated parameters."  AR 1092.  The Marine Corps

also stated that it would evaluate proposals "to determine whether the information

provided demonstrates an understanding of the existing network environment and

[performance work statement] requirements."  *Id.*  With regard to the technical evaluation

rating process, the solicitation stated that the agency would assign technical ratings to

"reflect[] the degree to which the proposed approach meets or does not meet the

solicitation's requirements through qualitative assessment of a proposal's strength,

weaknesses, significant weaknesses, deficiencies, omissions and/or risks."  AR 1093.

The solicitation stated that the Marine Corps "does not intend to award to any Offeror

whose proposal is evaluated as 'Marginal' or lower for any factor."  AR 1093.

The solicitation required offerors to include in their technical proposals a

contractor work breakdown structure with an "appropriate level of detail to provide the

government the ability to understand how the Offeror intends to manage the proposed

effort with visibility of tasks, activities, schedule, and list of deliverables."  AR 1085.  In

this connection, offerors were instructed to identify in the contractor work breakdown

structure "the number of personnel assigned to each task by labor category."  *Id.*  The

solicitation further directed offerors to include an initial staffing plan that "provides personnel with the requisite skills, experience, and qualifications to complete the requirements" of the solicitation.  AR 1086.  Additionally, the solicitation instructed the offerors to produce a Basis of Estimate ("BOE") which "shall include labor categories, labor descriptions, labor hours, and travel." AR 1087.  In order to ensure that the Marine Corps could match or trace labor categories, descriptions and hours, to proposed prices, the solicitation stated that the "proposal narrative, initial staffing plan, and BOE must use identical terminology to describe labor categories." *Id.*

Under the heading "Ground Rules and Assumptions," the solicitation required offerors to explain in the price volume "[a]ny inconsistency between promised performance, the technical proposal, identified personnel resources and cost/price."  AR 1087.  The solicitation stated that prices would be "evaluated, but not rated." AR 1096. Under this approach, the contracting officer was obligated to perform a price proposal analysis to determine whether the price was "fair and reasonable." *Id.*  In this connection, the contracting officer reserved the right to reject an offer if it was determined that unbalanced pricing posed an unacceptable risk to the government in accordance with FAR § 15.404-1(g). *Id.*  In addition, the solicitation provided that "[t]he proposed price to the Government must be compatible with the technical portion of the offer."  AR 1096. The solicitation stated that "[t]he Government intends to make a determination of fair and reasonable pricing on the basis of adequate competition. *Id.*

B.    Iron Bow's Original and Revised Proposals

Iron Bow submitted its original proposal on October 20, 2016.  AR 1526–1759 (proposal).  Iron Bow proposed using Network Access Control, Compliance and

Remediation ("NACCR") hardware manufactured by ForeScout.  AR 1527, 1541.  Iron Bow's original proposal included pricing for design, integration and sustainment.  With regard to sustainment, Iron Bow noted, in its price, that the quantity for sustainment in CLIN 34 was 12 months, in CLIN 35 was 12 months, and in CLIN 36 was 24 months. *Id.*

The Marine Corps determined that Iron Bow's original proposal contained "several material failures," including eight weaknesses and 21 deficiencies.  AR 1957.  The Marine Corps described each weakness and deficiency in a chart in the technical evaluation report.  AR 1957–62.  The Marine Corps also determined that other offerors had proposals with weaknesses and deficiencies.

The Marine Corps held discussions with Iron Bow, ACES, Booz Allen Hamilton and Three Wire following its evaluation of the proposals from December 1, 2016 through December 21, 2016.  AR 2009–12 (first round discussion letters), AR 2013–56 (responses), AR 2066–114 (requests for final proposal revisions and discussions); *see also* AR 2011 (evaluation notice to Iron Bow), AR 2046 (Iron Bow's email response to discussions notice), AR 2047–49 (Iron Bow discussions spreadsheet).  In its discussions with Iron Bow, the Marine Corps included each weakness and deficiency identified in the technical approach evaluation report, AR 2047–49, management approach evaluation report, AR 2050, and past performance evaluation report, AR 2051.

At the conclusion of discussions, the Marine Corps invited Iron Bow and the other offerors to revise and resubmit their proposals, referred to as "first final proposal revisions," or "FPR-1."  AR 2100–01.  Iron Bow submitted its FPR-1 on January 6, 2017. AR 2666–822 (first revised proposal).

The Marine Corps rated Iron Bow's FPR-1 as "unacceptable."  AR 2666–822 (first revised proposal), AR 2949 (technical evaluation report).  The Marine Corps explained in its evaluation that Iron Bow's first revised proposal did not fully address each of the requirements identified in the performance work statement and did not provide a detailed, comprehensive, or understandable technical approach.  AR 2950. While the Marine Corps acknowledged that Iron Bow's first revised proposal addressed "some deficiencies and weaknesses," the Marine Corps had identified in its initial proposal, the Marine Corps went on to find that Iron Bow "introduced new deficiencies and weaknesses" in its revised proposal.  *Id.*  In total, the Marine Corps identified ten weaknesses and four deficiencies in Iron Bow's first revised proposal.  AR 2950–53.

The Marine Corps stated that Iron Bow's revised proposal's BOE included labor categories that were not defined in or consistent with the technical narrative as required by the terms of the solicitation described above.  *Id.*  The Marine Corps also noted that it believed the labor hours proposed for project management were insufficient to support the entire contract period.  AR 2950.  Iron Bow's revised proposal also received:  (1) a weakness for underestimating the labor necessary to accomplish facility assessments, design, and installation, testing, and operator training, AR 2951; and (2) a deficiency for failing to include required "product vendor consultants" in the staffing plan and BOE. AR 2952–53 (technical approach evaluation), AR 2954 (management approach evaluation).

After sharing its comments with Iron Bow, the Marine Corps held a second round of discussions with the three remaining offerors. [4]  AR 2965–66 (evaluation notice), AR 2986–87 (request for final proposal revision), AR 2988–95 (discussion spreadsheet).  The discussions spreadsheet included the weaknesses and deficiencies identified in the technical evaluation report, AR 2988–95 and tracked the comments contained in the technical evaluation report.  *Compare* AR 2988–95 *with* AR 2950–53.  The Marine Corps specifically requested that a revised proposal "provide[] labor categories that are consistent with the BOE and narrative section of the proposal (Part 2 Section 2 Staffing Plan)."  AR 2988.  Iron Bow responded to the comments it received from the Marine Corps during this second round of discussions.

Iron Bow stated that it would,

> add the Labor Category ("LCAT") "Engineer Level 1" to the narrative of Part II Section 2.  Iron Bow has reviewed both Part II Section 2 and our BOE from the last submission and other than "Engineer Level 1" show the same LCATs.  Can the Government point to any other instance that Iron Bow's LCATs do not match our BOE?

*Id.*  In reply to Iron Bow's response, the Marine Corps acknowledged Iron Bow's response and further requested in its written comment back to Iron Bow, that Iron Bow update its proposal so that the labor categories identified in the BOE were consistent with the categories in the "narrative section of Part II Section 2, Initial Staffing Plan," and that the staffing plan include labor categories that will be filled using "[original equipment manufacturer ("OEM")] support personnel."  *Id.*  As an example, the Marine Corps

---

[4] Initially, the contract in question had four offerors but Three Wire Systems did not submit a second revised final proposal after the first round of discussions had been completed.

identified two labor categories that were noted in the staffing plan narrative but were not

included in the narrative's table of proposed labor categories.  *Id.*  Specifically, the

Marine Corps noted,

> An example of inconsistent proposal information is the narrative
> provided in Part 2 Section II: 'this will include the following
> roles: Project Manager, Lead, Engineer, ForeScout Architect,
> and Information Assurance Lead,' but the Lead Engineer and
> ForeScout Architect are not addressed in the 'labor category
> prerequisites' table.

*Id.*

The Marine Corps also explained that Iron Bow had received a weakness on

review because the Marine Corps believed Iron Bow did not have enough labor hours to

accomplish the work contemplated by the proposed contract.  Specifically, the Marine

Corps stated,

> labor hours and durations for CLIN[s] 0004 through 0011 are
> underestimated for the scope of facility assessments.  Labor
> hours for CLIN[s] 0012 through 0019 are underestimated at the
> heavily populated regions and the geographically dispersed user
> base.  Labor hours for CLIN[s] 0024, 0025, 0027, and 0029 are
> underestimated at the heavily populated regions and the
> geographically dispersed user base.

*Id.* (Column 6) (the level of effort weakness).  The Marine Corps specifically requested

that Iron Bow update its technical approach "to support their staffing plan as it relates to

their proposed scope of facility assessment, design, and integration."  *Id.*

In response to the Marine Corps questioning of the hours proposed, Iron Bow

responded by stating that it did not intend to add any hours because it believed it had the

work covered by the hours provided. Iron Bow stated,

> The Iron Bow Team has extensive experience scoping and
> delivering services of this magnitude and feel we proposed a
> LoE [level of effort] that has accounted for the necessary

services to successfully complete the tasks required.  We scoped
CLIN[s] 0001 & 0002 with much of the needed PS Labor since
this will be the initial phase of the project and likely the most
challenging while allowing for reduced/eliminated redundancies
and built economies of scale into the CLIN[s] in question.  We
are confident we had proposed a LoE that would provide for a
successful project assessment, design and integration with
qualified personnel.

With over a decade of successful delivery of firm-fixed price
services to the Government, Iron Bow is confident that the team
we have compiled [sic] is capable of delivering successfully to
this requirement.  Our company's financial strength ($850
million in annual revenue) provides the Government with the
assurance that we will stand behind our proposal.  We commit
that we will provide what is required for successful completion
and implementation of this project.  We welcome any additional
clarification to the requirement and will adjust our response to
increase your confidence in Iron Bow.

*Id.*

The Marine Corps acknowledged Iron Bow's response and requested that Iron
Bow "update its FPR BOE as necessary."  *Id.*  The Marine Corps informed Iron Bow, and
the other offerors, that the "Government anticipate[d] the labor needed for Facility
Assessment, Design, and Install/Test/Doc to be divided up 10%, 30%, 60% respectively."
*Id.*  The Marine Corps however anticipated labor need was "[p]rovided for informational
purposes only" and that "[o]fferors are NOT required to use" the Marine Corps'
anticipated labor distribution.  *Id.*

During discussions, the Marine Corps also reemphasized the expectations laid out
in the solicitation for the content of the technical approach.  Specifically, on the
spreadsheet it provided to Iron Bow with its comments, in Row 7, Column 11, the Marine
Corps explained that it "expects the technical approach to describe how Iron Bow, as the

integrator, will authoritatively design and integrate to meet the specified requirements without reiterating the inherent capabilities of ForeScout." *Id.*

At the conclusion of discussions, the Marine Corps invited Iron Bow and the other two remaining offerors to revise and resubmit their proposals. AR 2986-87. Iron Bow submitted a second revised proposal. AR 3440-539. In its submittal, Iron Bow included a modified version of the spreadsheet the Marine Corps had used for the second round of discussions setting forth Iron Bow's responses. AR Suppl. 3607.1–3607.7. Specifically, Iron Bow added a column entitled "documented change." *See, e.g.*, AR Suppl. 3607.1. In the row addressing the traceability weakness, Iron Bow added the statement "Part 2 Section 2 (both text and Table 1) and Part 4 Section 1 BOE Tab were both updated to use same LCATs." AR Suppl. 3607.1 (row 1). Additionally, in the row addressing the level of effort weakness, Iron Bow inserted the statement "Part 2 Section 2 and Part 4 Section 1 BOE Tab were both updated. Our approach is explained in Part 2 Section 2, lines 23-51." *Id.* (row 6).[5]

Iron Bow made changes to the staffing plan in its second revised proposal (FPR-2) and added statements on the spreadsheet regarding its revenues, financial strength, and commitment "to provide whatever is required for successful completion and implementation of this project." *See* AR 3577 (redlined version).

---

[5] In Part II "Management Approach," Section 2 "Staffing Plan," Iron Bow provided a two page description of an updated staffing approach which includes new labor categories such as "ForeScout Architect", "Team Architect" and "Sustainment Engineer." AR 3578-9. The Marine Corps found that the new staffing plan, which was never discussed with the Marine Corps during the discussion period but was included in Iron Bow's FPR-2, could not be traced to changes Iron Bow made to the BOE in its FPR-2.

Iron Bow added a new "staffing approach" section.  *Id.*  Iron Bow explained that it "decided to modify our proposal" based upon "the feedback provided by [the] Government."  *Id.*  Iron Bow modified its proposal to include, among other things, four deployment teams and a sustainment team.  AR 3577–78.  Iron Bow also changed the table disclosing the qualifications for each proposed labor category.  AR 3579-80. Revisions were submitted by February 16, 2017. AR 2987.

Iron Bow also substantially revised its BOE in its final submission.  AR Suppl. 3482.8–3482.11.  Iron Bow changed the labor categories proposed in each CLIN, the number of labor hours proposed, and the price.  *Id.*  In its price, Iron Bow identified the quantity for sustainment in CLIN 34 as 12 months, in CLIN 35 as 12 months, and in CLIN 36 as 24 months.  AR Suppl. 3482.1-3482.2.[6]

C.   Marine Corp's Rejection of Iron Bow's Second Revised Proposal and Final Award Decision

1.   The Marine Corps' Technical Evaluation

The Marine Corps determined that Iron Bow, ACES and Booz Allen Hamilton, Inc. were all in the competitive range.  AR 3693.  For the reasons discussed below, Iron Bow's second revised proposal received only a "marginal" technical rating.  AR 3624. The Marine Corps credited Iron Bow for correcting four deficiencies and nine weaknesses.  AR 3625.  However, Iron Bow received a significant weakness based on the Marine Corps' finding that Iron Bow had failed to substantiate or explain the increase in

---

[6] Iron Bow claims that although it always included CLIN 36 at 24 months it had previously mistakenly only included a price for 12 months and with this change added more hours to reflect the 24 month period.  Pl.'s Motion for Judgment on the Administrative Record (MJAR) at 19. Iron Bow argues that the Marine Corps should have known that it was doubling the labor hours for CLIN 36 to fix this mistake.

labor hours in its second revised final proposal.  AR 3625–26.  Specifically, the

Technical Evaluation Report ("report") stated:

> During discussions round 2, the Government requested that the
> Offeror substantiate hours associated with CLIN[s] 0012-0019
> and 0024, 0025, 0027 and 0029 for proposed design and
> integration activities.  It was the Government's conclusion
> during FPR-1 that the labor hours associated with these CLIN[s]
> appeared to be underestimated at the heavily populated regions
> based on the number of endpoints being managed.  The
> Government requested that the Offeror substantiate the labor
> hours being proposed in their technical approach during
> discussions, round two (2).

AR 3625.  The report went on to explain that in response to that criticism, Iron Bow had

indicated that Iron Bow did not intend to change its labor hours.  AR 3625-26.  Rather, as

quoted above, Iron Bow explained that it had "over a decade of experience of firmed-fix

price contracting with the Government" and that Iron Bow intended to "stand behind our

proposal." *Id.*  It is against this backdrop that the report went on to state that:

> The Government further provided to all Offerors in the second
> round of discussions that the expectation for the integration
> effort was envisioned to occupy approximately 60% of the total
> labor being proposed, however, they were not required to
> propose to that percentage.  Despite Iron Bow's discussion
> response of standing behind what had been previously proposed,
> its FPR-2 contained adjusted labor hours associated with the
> aforementioned design and integration CLIN[s]; the adjustment
> equaled a 3,000 (25%) increase in proposed labor hours from the
> original proposal.  Despite the FPR-2 labor hour increases to
> these design and integration CLIN[s], Iron Bow's technical
> approach was not updated to substantiate or account for these
> changes on how they would be employed.

AR 3625-26.  Because Iron Bow failed to substantiate the 25% increase in labor hours,

the Marine Corps stated that it was unable to determine the reasonableness of Iron Bow's

approach for accomplishing the design, integration and sustainment activities needed to

successfully implement the proposed contract.  AR 3626 ("Although Iron Bow updated

its BOE, its technical approach was not updated to substantiate or account for the changes

made in FPR-2 for its increase of labor hours.  Therefore, the Marine Corps was unable to

determine the reasonableness of the proposed labor hours as they would apply to the

technical approach, and determined that this introduces a high level of risk of

unsuccessful performance of the proposed design and integration, and sustainment

activities.").

Further, the Marine Corps noted that the labor categories proposed in the BOE for

design and integration activities were not consistent with Iron Bow's revised staffing

plan.  *Id., See* n.5.  The Marine Corps specifically highlighted the mismatch between the

labor narrative for cyber security engineering and the BOE for design (CLINs 22-29)

activities as an example of how, despite the repeated call for clarity in the solicitation's

instructions, Iron Bow had failed to explain its proposed cyber security engineering

staffing allocation among tasks, stating:

> For example, there was no Cyber Security Engineering labor
> proposed in any of the design CLIN[s].  Per PWS section 3.3.4
> and the required [Contract Data Requirement Lists] in this area,
> there is no traceability of how the proposed NACCR solution
> will achieve the required Interim Authority To Test (IATT) and
> Assessment & Authorization (A&A) without the required Cyber
> Security Engineering in the design phase.  Therefore, the
> Government was unable to determine the reasonableness of the
> proposed labor hours as they would apply to the technical
> approach.  Additionally, Iron Bow's proposal only included one
> Cyber Security Labor category in Integration despite the
> proposed staffing plan having outlined 4 Cyber Security related
> billets.

AR 3626.

The Marine Corps also noted that it could not understand why Iron Bow had significantly increased the labor hours for sustainment activities, AR 3626, stating:

> In addition, the adjustments made to the labor distribution in FPR-2 further increased the proposed labor hours for sustainment activities in CLIN[s] 0034, 0035, and 0036 by 26% over FPR-1—FPR-1 proposed 18,719 hours for sustainment and FPR-2 adjusted these hours to 23,530.  As such, Iron Bow proposed 43% of the total labor to sustainment activities versus 18% of labor hours for the complex systems integration.

AR 3626.  In this connection, the Marine Corps explained that the labor hours Iron Bow had initially proposed for sustainment had never been questioned by the Marine Corps and thus had not been identified in discussions.  *Id.*  The Marine Corps stated that in such a circumstance, it could not understand why Iron Bow had added 26% more hours for sustainment.  The Marine Corps concluded, lacking an explanation from Iron Bow, that the labor hours proposed for sustainment activities were "overstated and excessive" for the amount of associated work.  *Id.*  The Marine Corps observed that the labor hours in CLIN 36 were double the hours from those previously proposed for the same 24 month period, and that the proposed labor was not warranted by the work for that CLIN.[7]  *Id.*

In this connection, the Marine Corps further explained that a significant portion of the increase was for cyber security engineering labor, but the magnitude of the increased labor was not supported by Iron Bow's proposal to staff the post-deployment sustainment team with only one cyber security engineer.  *Id.*  (While the "increase was applied to Cyber Security Engineering activities," this was "not consistent with the proposed staffing plan for the number of Cyber Security Engineering billets.  The total number of

---

[7] As discussed in n.6, Iron Bow argues that the Marine Corps should have known it was fixing a mistake concerning the estimated hours.

Cyber Security Engineering labor hours proposed in CLIN 0036 exceeds the total number

of Cyber Security Engineering billets proposed in the staffing plan.")  For all these

reasons, the Marine Corps technical team determined that Iron Bow's proposal was

technically "marginal" and posed a high risk of unsuccessful performance.  *Id.*

2. The Source Selection Authority's Final Evaluation

Before making its final decision regarding Iron Bow, the Source Selection

Authority reviewed the Technical Evaluation Report, AR 3608-3627, and the Price

Evaluation Report, AR 3635-3652.  With regard to the Technical Evaluation Report, the

source selection authority memorandum summarized the conclusions of the technical

evaluation team and concluded that because Iron Bow had failed to update its technical

approach to substantiate or account for the significant changes Iron Bow elected to make

in its FPR-2 after the close of discussions and without explanation during the discussions

period, the Marine Corps was unable to determine the reasonableness of Iron Bow's

increased proposed labor hours in various categories because it could not trace the

increases to any changes in Iron Bow's technical approach.[8]  AR 3684-85.

With regard to the Price Evaluation, the source selection memorandum stated that

it was not possible to determine whether Iron Bow's proposed price was reasonable

because Iron Bow's price could not be matched up with its technical approach.  *See* AR

3686.  The Marine Corps explained that it could not determine that the total contract price

was reasonable because it was not consistent with Iron Bow's technical solution, AR

---

[8] As noted previously, the number of labor hours for design and integration were increased by
25% and the number of labor hours for sustainment was increased by 26%.

3650, as required by the solicitation, AR 1096 (requiring that, "[t]he proposed price to the Government must be compatible with the technical portion of the offer."). AR 3650.

It was for all of these reasons that the Source Selection Authority concluded in its best value determination that Iron Bow's proposal was unawardable. AR 3690.

3.     The Marine Corps Award To ACES and Post Award Debriefing

The Marine Corps awarded the contract to ACES on March 22, 2017, AR 3716, after the Source Selection Authority determined that ACES's proposal presented the best value to the Marine Corps. AR 3690. The Marine Corps informed Iron Bow that it was not selected for an award on March 23, 2017. AR 3714. The Marine Corps provided a debriefing letter to Iron Bow on March 31, 2017. AR 3808. The debriefing letter repeated the Marine Corps' discussion comments and the findings from the technical evaluation team, price evaluation team, and the Source Selection Authority regarding Iron Bow's technical and price proposals. AR 3809–10. The debriefing letter stated that Iron Bow's proposal received ratings of "satisfactory" for past performance, "acceptable" for small business participation, and "acceptable" for management factor. AR 3810. The debriefing letter further stated that the proposal received a rating of "marginal" for the technical approach, with no strengths, no deficiencies, no weaknesses, and one significant weakness. AR 3809.

In the Post Award Debriefing, Contracting Officer Tammy E. Famoso stated that the significant weakness identified in Iron Bow's FPR-2 was related to the technical approach, the BOE, and the distribution of labor hours. AR 3809. Ms. Famoso noted that while Iron Bow increased the labor hours proposed for design and integration CLINs, "Iron Bow's Technical approach was not updated to substantiate or account for these

changes." AR 3809. Ms. Famoso concluded that "the Government was unable to determine the reasonableness of the proposed labor hours as they would apply to the technical approach." *Id.* Ms. Famoso further noted that "Iron Bow's proposal did not include any Cyber Security Engineering hours in design, and only included one Cyber Security Labor category in Integration, despite the proposed staffing plan having outlined 4 Cyber Security related billets." *Id.* Based on the above-stated weaknesses relating to the technical approach and inconsistencies between the technical approach and the BOE, Ms. Famoso stated that the Marine Corps could not determine that the price was reasonable. AR 3810. The Marine Corps informed Iron Bow that the proposal was unawardable because the solicitation provided that "[t]he Government does not intend to award to any Offeror whose proposal is evaluated as 'Marginal' or lower for any factor;" and "[t]he proposed price to the Government must be compatible with the technical portion of the offer." AR 3811.

D.     Iron Bow's Protest Before the GAO

Iron Bow filed a bid protest before the Government Accountability Office ("GAO") on April 4, 2017, challenging the award decision on the grounds that the Marine Corps' technical evaluation was not supported. AR 3841. The Marine Corps issued a stop work order to ACES on April 5, 2017. GAO dismissed the protest on April 27, 2017 on the grounds that Iron Bow was not an "interested party." AR 3885-87. The GAO found that Iron Bow lacked the requisite interest to challenge the award because it

failed to expressly challenge the Marine Corps' evaluation or failure to evaluate its price.[9]

E.     The Present Litigation

Iron Bow filed its complaint in this court on May 4, 2017 challenging the Marine Corps' technical evaluation and price evaluation of its proposal.  Compl. ¶¶ 25–29, 36–50 (technical), 30–31, 51–53 (price).  Iron Bow moved for a temporary restraining order and preliminary injunction on May 5, 2017.  ECF Nos. 5-6.  The defendant and ACES opposed Iron Bow's motion.  ECF Nos. 19, 21.  The court denied Iron Bow's motion on May 23, 2017, holding that Iron Bow was not likely to succeed on the merits of its claim, and that the balance of hardship and public interest weigh against preliminary injunctive relief.  ECF No. 28.  Iron Bow moved for judgment on the administrative record on June 9, 2017.  ECF No. 32.  Briefing on Iron Bow's motion and on the defendant and defendant-intervenor's cross-motions and the defendant's motion for dismissal has been completed.  Oral argument was heard on August 22, 2017.

II.   **LEGAL STANDARDS**

A.     Bid Protest Jurisdiction

The United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract [by a federal

---

[9] The GAO stated that "[u]nder the bid protest provisions of the Competition in Contracting Act of 1984, 31 U.S.C. §§ 3551-3556, only an 'interested party' may protest a federal procurement. That is, a protester must be an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or the failure to award a contract. Determining whether a party is interested involves consideration of a variety of factors, including the nature of issues raised, the benefit or relief sought by the protester, and the party's status in relation to the procurement."  AR 3886

agency] or any alleged violation of statute or regulations in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). As a threshold matter, to maintain a bid protest in this court, the protestor must establish that it has standing. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The standing inquiry "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III," and circumscribes the pool of potential plaintiffs to "interested part[ies]," as that term is defined under the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551–56. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *See also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To establish standing, a protestor must establish that (1) it is an actual or prospective bidder, and (2) it has a direct economic interest in the procurement. *Weeks Marine*, 575 F.3d at 1359 (quoting *Rex Serv. Corp.*, 448 F.3d at 1307. "To prove a direct economic interest, a party must show that it had a substantial chance of winning the contract." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)) (internal quotation marks omitted). In this connection, a party must "show that it was prejudiced by a significant error in the procurement process." *Id.* (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009)). To satisfy the prejudice requirement, the party must show that "'but for the [Government's] error,' the party 'would have had a substantial chance of securing the contract.'" *Id.* at 1359 (quoting *Labatt Food*, 577 F.3d at 1378). Prejudice is a factual question. *Id.* Subject

matter jurisdiction is a threshold matter that the court must decide at the outset of the case. *See Steel Co. v Citizens for a Better Env't*, 523 U.S. 83, 94-97 (1998).[10]

B.       Motion for Judgment on the Administrative Record

Rule 52.1( c) of the Rules of the Court of Federal Claims ("RCFC") provides for motions for judgment on the administrative record.  A motion for judgment on the administrative record is distinguishable from a motion for summary judgment "requiring the absence of a genuine issue of material fact."  *Bannum Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005).  In the context of bid protests, the standard of review is set in section 1491(b)(4), which requires the court to "review the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA").  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000).  Under section 706, an agency's decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *Banknote Corp. of Am. v. United States*, 365 F.3d1345, 1350–51 (Fed. Cir. 2004) (quoting *Advanced Data*, 216 F.3d at 1057–58). This review is on the administrative record and requires the court to consider whether based on the evidence in the record the agency decision: (1) "lacked a rational basis;" or

---

[10] More importantly the court reviews prejudice both in its determination of whether the protestor has standing and when reviewing the merits of the protest. *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010).  As explained in *Linc*, "prejudice is a threshold jurisdictional issue that … must be reached before addressing the merits in a bid protest."  *Linc* at 694.  The court in *Linc* also determined that only if the protestor has demonstrated allegation prejudice, and only "where the [protestor] succeeds on the merits of some but not all of its allegations" is a second analysis of prejudice of the error necessary. *Id.* at 696-697.

(2) "involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332

(citations omitted); *see also* 5 U.S.C. §§ 702, 706(2)(A).

It is now well-settled that a procurement decision is rational if "the contracting

agency provided a coherent and reasonable explanation of its exercise of discretion."

*Impresa*, 238 F.3d at 1333.  The court's review is "highly deferential," and "the

disappointed offeror bears a 'heavy burden' of showing that the award decision 'had no

rational basis,'" *Impresa*, 238 F.3d at 1333; *see also Bahrain Mar. & Mercantile Int'l*

*BSC v. United States*, 118 Fed. Cl. 462, 478 (2014) (citations and internal quotations

omitted).  The protestor "must identify 'hard facts;' a mere inference or suspicion of an

actual or alleged error is not enough" to satisfy the protestor's burden.  *PAI Corp. v.*

*United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (citing *C.A.C.I., Inc.-Federal v.*

*United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).  The court may not substitute its

own judgment for that of the agency, even if reasonable minds could reach differing

conclusions.  *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281,

285-86 (1974).  A protestor may "succeed only where the agency 'entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or the decision is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.'"

*Bahrain Mar.*, 118 Fed. Cl. at 478 (quoting *Ala. Aircraft Indus., Inc.–Birmingham v.*

*United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)).

With regard to alleged errors of law, a protestor must demonstrate "'a clear and

prejudicial violation of applicable statutes or regulations.'"  *Impresa*, 238 F.3d at 1333

(citation omitted); *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.

1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").

## III.   DISCUSSION

### A.   Iron Bow Has Standing to Challenge the Adequacy and Correctness of Discussions

The court's first obligation is to determine if Iron Bow has standing to bring this bid protest.  The government and ACES had originally argued that Iron Bow did not have standing because in its motion for judgment on the administrative record, Iron Bow did not directly challenge the Marine Corps' price evaluation. Def's Reply at 10, Def-Int's Reply at12.  In response, Iron Bow argued that it had alleged sufficient errors with regard to errors in the discussion process with the Marine Corps to establish standing.  Pl.'s Reply at 3-4.  Iron Bow maintains that but for these errors, it would have produced a substantially different FPR-2, which would have contained an updated technical approach.  Pl.'s MJAR at 3.  Iron Bow explains that with the updated technical approach, the Marine Corps would have evaluated their FPR-2's technical approach as sufficient, determined that Iron Bow's price was reasonable, and awarded the contract to Iron Bow. *Id.*  Neither the government nor ACES takes serious issue with Iron Bow's standing on this ground.

The court agrees with Iron Bow that it has standing to adjudicate this bid protest. Throughout the rounds of submissions, Iron Bow submitted proposals and was determined to be in the competitive range.  Thus, it was an actual bidder for the contract at issue in this litigation and has demonstrated that it has a direct economic interest in connection with the subject contract.  Moreover, if it were to prevail, Iron Bow would be

entitled to a new round of discussions, could correct the significant weakness in its

technical approach, and potentially receive the contract. In such circumstances, Iron Bow

has established standing.

      B.     Iron Bow Has Not Demonstrated Any Error Regarding Discussions

          1.     Discussions Generally

    The law with regard to discussions is well-settled.  "At a minimum the

contracting officer must … discuss with, each offeror still being considered for award,

deficiencies, significant weakness, and adverse past performance information to which

the offeror has not yet had an opportunity to respond."  48 C.F.R. § 15.306(d)(3).

However, "[t]he scope and extent of discussions are a matter of contracting officer

judgment."  *Id.*  Accordingly, "the contracting officer has considerable discretion

regarding the contents of the discussions."  *IBM Corp. v. United States*, 101 Fed. Cl. 746,

764 (2011).

    "There is no rule" that requires an agency "discuss every weakness appearing in. .

. [a] proposal."  *Lyon Shipyard, Inc. v. United States*, 113 Fed. Cl. 347, 356 (2013); *see

also* 48 C.F.R. § 15306(d)(3) (stating that "the contracting officer is not required to

discuss every area where the proposal could be improved").  Government agencies need

not "'spoon-feed' an offeror as to each and every item that must be revised, added or

otherwise addressed to improve a proposal," nor are agencies required to "address in

express detail all inferior or inadequate aspects of a proposal."  *D & S Consultants, Inc. v.

United States*, 101 Fed. Cl. 23, 40 (2011) (citations omitted).  An agency satisfies its

obligation regarding meaningful discussions when it "generally lead[s] offerors into the

areas of their proposals requiring amplification or correction."  *PGBA, LLC v. United*

*States*, 60 Fed. Cl. 196, 217 n.25 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004) (citation omitted); *accord D & S Consultants*, 101 Fed. Cl. at 40.

In this connection, an agency may not mislead an offeror during discussions, nor may an agency favor one offeror over another. *See DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 669–70, 672 (2010); 48 C.F.R. § 15.306(e)(1).  An agency cannot "misdirect[s] the protestor as it revises its proposal." *DMS All-Star Joint Venture*, 90 Fed. Cl. at 670 (citation omitted).  The government is not, however, under an obligation to address issues that were not problematic in a proposal.  Where an offeror decides to make changes to a proposal without raising the proposed changes first with the government during the discussion phase, the offeror runs the risk that the changes will be misunderstood or rejected.  As the GAO recently explained in a protest, much like this one involving a changed proposal, "in a post-discussion proposal revision, an agency has no duty to reopen discussions or conduct additional rounds of discussions." *Matter of Raytheon Con.*, B-403110.3 (Apr. 26, 2011).[11]

> 2.   The Marine Corps' Discussions With Iron Bow were Adequate and Not Misleading

Iron Bow makes four arguments with regard to its discussions with the Marine Corps.  First, Iron Bow contends that the Marine Corps failed to disclose that it needed to substantiate the labor hours it added to its proposal for design and integration.  Pl.'s

---

[11] In *Raytheon*, the protestor had significantly changed the design portion of the proposal after the close of discussions, which resulted in the government finding a weakness.  The GAO determined that if the changes were made subsequent to the close of discussions and were not prompted by those discussions, there was no requirement to raise that weakness during discussion or reopen discussions.  *See also, Honeywell Tech. Solutions, Inc.,* B‑400771 (Jan. 27, 2009); *URS Fed. Servs., Inc.; ManTech Telecomm. & Info. Sys. Corp.,* B–408678.5 et al., (June 20, 2014).

MJAR at 4-5.  Iron Bow contends that the reasons for the additional hours should have been self-explanatory.  Iron Bow increased the hours because the Marine Corps criticized Iron Bow for not having sufficient hours in these categories.

Iron Bow's contention that it did not understand that the Marine Corps wanted it to better explain how it intended to deploy its labor hours towards design and integration is refuted by the administrative record.  Both the government and ACES point out that the Marine Corps told Iron Bow twice that it needed to justify the labor hours proposed for its technical approach.  AR 2988.  First, in Row 6, Column 8 of the discussions, the Marine Corps instructed Iron Bow to "provide an updated technical approach to support their staffing plan as it relates to their proposed scope of facility assessment, design, and integration."  *Id.*  Second, in Row 7, Column 11, the Marine Corp explained that it "expects the technical approach to describe how Iron Bow, as the integrator, will authoritatively design and integrate to meet the specified requirements without reiterating the inherent capabilities of ForeScout."  *Id.*  The government and ACES argue that these two comments by the Marine Corps which were made during the second round of discussions were sufficient to put Iron Bow on notice that it might receive a "significant weakness" if it did not better tie the hours it proposed to its technical approach.  Def.'s Opp'n and Cross MJAR at 32-33; Def.-Int's Opp'n and Cross MJAR at 21

The court agrees with the government and ACES.  The government need only "generally lead" an offeror to an area of their proposal requiring improvement.  *See PGBA, LLC v. United States*, 60 Fed. Cl. 196, 217 n. 25 (2004).  The Marine Corps was not required to give every specific instance where their technical approach contained weaknesses.  *See D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40 (2011).

By putting Iron Bow on notice that it had not adequately explained its hours in the context of its technical approach, the Marine Corps met its obligation with regard to Iron Bow's first objection to discussions.  Moreover, whereas here, the solicitation repeatedly instructed offerors to provide sufficient details justifying their proposal, Iron Bow's contention that it was not aware of the obligation is not supported.

Iron Bow next argues that it was misled by the Marine Corps in the discussions when the Marine Corps "acknowledged" Iron Bow's explanation regarding its initial decision not to change its labor hours for design and integration.  Iron Bow claims that it took from this "acknowledgment" that its use of labor hours did not have to be further substantiated.  Pl.'s MJAR at 4-5.  Iron Bow specifically points to the Marine Corps' "acknowledge[ment]" of Iron Bow's response to the Marine Corps' concern that the design and integration labor hours were too low.  *Id.*  In its response, as noted above, Iron Bow told the Marine Corps that based on its experience it believed it had allocated sufficient hours to design and integration.  AR 2988.  Iron Bow claims that it reasonably understood that the Marine Corps by acknowledging Iron Bow's response had found Iron Bow's response "acceptable."  Pl.'s MJAR at 4-5.  Iron Bow argues that in such circumstance, Iron Bow reasonably believed that when it added more hours to meet the Marine Corps' criticism it did not have to explain how those increased hours would be deployed but only what those hours would mean for its price as reflected in its BOE.  *Id.*

The government and ACES argue the Marine Corps' acknowledgment of Iron Bow's response cannot be reasonably read to mean that the Marine Corps had determined that the weakness the Marine Corps had identified in its comment had been rectified.  Def.'s Opp'n and Cross MJAR at 34-35; Def.-Int's Opp'n and Cross MJAR at 24-25.  An

acknowledgment, they argue, means only a recognition of the statement, not acceptance of the response. The court agrees. By acknowledging the receipt of a response by Iron Bow, the Marine Corps did not convey to Iron Bow that the weakness identified had been rectified. Thus, Iron Bow was not mislead into believing that it did not need to update their technical approach to substantiate any labor hour increases.

As for Iron Bow's contention that it took from that "acknowledgment" that Iron Bow would not need to explain how Iron Bow would use the additional hours proposed, the court agrees again with the government and ACES that Iron Bow's view is refuted by the terms of the solicitation and the Marine Corps' repeated comments regarding Iron Bow's need to better explain the relationship between its labor hours and its technical approach. The Marine Corps expressly told Iron Bow that it needed to update its technical approach during discussions to explain how it will perform the requirements of the contract. *See* AR 2999 (Row 7, Column 11).

Finally, to the extent that Iron Bow contends that the Marine Corps was obligated to hold another round of discussions with Iron Bow if it did not understand how Iron Bow intended to use its increased design and integration hours, the court agrees with the government and ACES that this argument must be rejected. The Marine Corps had no obligation to reopen discussions with Iron Bow regarding changes it made after the close of discussions and after Iron Bow had expressly told the Marine Corps it would not be changing its proposed hours for design and integration. *See Matter of Raytheon Con*., B-403110.3 (Apr. 26, 2011); *Honeywell Tech. Solutions, Inc.,* B‑400771 (Jan. 27, 2009); *URS Fed. Servs., Inc.; ManTech Telecomm. & Info. Sys. Corp.,* B-408678.5 et al., (June 20, 2014); *See also* n.11. The Marine Corps did not mislead Iron Bow into believing it

had satisfied the weakness identified or that any change to its hours needed to only be reflected in the BOE.

Third, Iron Bow argues that it was misled by the Marine Corps in discussions because it is now being penalized for adding hours that the Marine Corps thought were needed to properly perform the contract with regard to design and integration. Pl.'s MJAR at 6. The record shows that the Marine Corps found a significant weakness with the design and integration hours not because Iron Bow increased the hours for design and integration but because Iron Bow significantly increased the number of hours for these tasks without substantiating the hours in the technical approach. AR 3809-3810. The significant weakness that led to the Marine Corps' decision that Iron Bow's proposal was unawardable came about only after the end of discussions. Had Iron Bow suggested during the discussions with the Marine Corps that it was going to significantly increase the labor hours for design and integration to meet the Marine Corps' concerns, Iron Bow's argument might have had merit. However, because Iron Bow told the Marine Corps during the discussions it would not increase its hours, the Marine Corps was not irrational in concluding that Iron Bow's decision to increase hours without explanation reflected a lack of understanding of the required tasks.

Fourth, Iron Bow argues that the discussions were inadequate or misleading because the Marine Corps never raised concerns about Iron Bow's cyber security staffing during the second round of discussions, but cited cyber security staffing as an issue. Pl.'s MJAR at 5-6. Here again, Iron Bow has failed to understand the basis for the Marine Corps comment. As the government and ACES argued the Marine Corps referenced cyber security engineers as one example of where Iron Bow's BOE was inconsistent with

the labor narrative.  *See* AR 3809-3810.  The court agrees.  Iron Bow failed to include cyber security engineers for the design CLINs in the BOE, despite stating that it would in the labor narrative.  There was nothing improper or misleading in the discussions regarding cyber security engineers.  The Marine Corps did not find a significant weakness in Iron Bow's proposal because it lacked cyber security engineers.  Rather, the issue was identified as an example of where Iron Bow had failed to connect its narrative with its pricing as required by the solicitation, which made it impossible for the Marine Corps to trace the costs and thereby evaluate Iron Bow's proposed approach in a best value determination.

For all of these reasons, the court finds that the discussions with Iron Bow were meaningful and not misleading and that the Marine Corps rationally evaluated Iron Bow's technical approach based on the information provide by Iron Bow.

3.    The Marine Corps' Technical Evaluation Of Iron Bow's Second Final Proposal Revision With Regards to Sustainment Was Reasonable.

In addition to its objections to the Marine Corps' discussions, Iron Bow argues that the Marine Corps erred in concluding that Iron Bow had failed to justify its increase in sustainment hours Iron Bow included in its final proposal and for this reason the Marine Corps' technical evaluation is not supported and thus arbitrary and capricious. Iron Bow argues that the Marine Corps criticized Iron Bow for increasing sustainment hours by 26 percent when in fact Iron Bow claims it was correcting an error that the Marine Corps had failed to identify in Iron Bow's BOE.  Specifically, Iron Bow explains that it failed to accurately account for all of the hours needed for sustainment in the 24 month period and thus it properly fixed that error in its final proposal to the Marine

Corps.  *See* n. 6.  When the Marine Corps saw the increase of hours, Iron Bow argues, the

Marine Corps erroneously assumed that Iron Bow was increasing hours without any

justification.  According to Iron Bow, the Marine Corps should have known that Iron

Bow was merely correcting a mistake Iron Bow had made in its previous proposals.  Pl.'s

MJAR at 2–3, 18–19.

The government and ACES argue that Iron Bow's argument is without merit

because Iron Bow failed to comply with the traceability requirements as outlined in the

solicitation.  Def.'s Opp'n and Cross MJAR at 28; Def.-Int's Reply at 3.  The government

and ACES further argue that Iron Bow's argument is without merit because Iron Bow

also failed to fully explain its proposal as required by the solicitation.  *Id.*  The court

agrees.  Under the terms of the solicitation, Iron Bow was required to explain any

changes it made to labor hours for sustainment activities and how it intended to use those

hours to execute its technical approach.  The fact that the Marine Corps may have

misunderstood Iron Bow's purpose in increasing its hours is not the fault of the Marine

Corps.  It is "not the agency's obligation during the evaluation process to fill in the gaps

or to perform a 'leap of faith.'"  *G&M Indus.*, B-290354, 2002 CPD ¶ 125, 2002 WL

1586326, at *3 (Comp. Gen. July 17, 2002).  Iron Bow could not reasonably assume that

the Marine Corps would understand why these hours increased[12], *see* AR 1077

(instruction d), and it would have been unlawful for the Marine Corps to overlook Iron

Bow's failure to comply with the solicitation instructions, *see, e.g.*, *Red River Holdings,*

---

[12] Plaintiff alleges that the Marine Corps should have known that they were doubling the hours
for CLIN 36 because Iron Bow had previously calculated the hours based on a 12 month
performance period rather than the 24 months.  Pl.'s MJAR at 19.

*LLC v. United States*, 87 Fed. Cl. 768, 786-88 (2009).  The solicitation, as noted above, required Iron Bow to submit a complete proposal with sufficient detail to permit the government to evaluate the submission.  AR 1076-77, 1084.  Under these terms, Iron Bow was required to explain why it had increased its labor hours for sustainment.  The Marine Corps notified Iron Bow that subsequent changes to its proposal would be evaluated to determine whether such changes were acceptable.  AR 2986 (encouraging Iron Bow to limit any changes "to those areas addressed in discussions," and warning that "areas already found acceptable but subsequently changed . . . could be found unacceptable during final evaluations.")  The Marine Corps also notified Iron Bow that it must submit a complete revised proposal that complied with the solicitation instructions and requirements.  *Id.*  Because Iron Bow did not comply, the Marine Corps reasonably concluded that Iron Bow's large and unexplained 26 percent increase in sustainment hours indicated that Iron Bow did not understand the tasks required under the proposal and thus Iron Bow's approach posed a high risk.  AR 3626.  Put another way, any misunderstanding by the Marine Corps was caused by Iron Bow and does not render the Marine Corp's technical evaluation of Iron Bow's technical approach arbitrary or capricious.

## IV.    CONCLUSION

For the reasons stated above, Iron Bow's motion for judgment on the administrative record is hereby **DENIED**.  The Government and ACES motions for judgment on the administrative record is hereby **GRANTED**.  The clerk is instructed to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge